# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MELANIE WILSON,                    :
            Plaintiff              :          Civil Action No. 3:02-CV-1026(CFD)
                                   :
v.                                 :
                                   :
CITY OF NORWICH,                   :
LOUIS T. FUSARO, and               :
JAMES F. DAIGLE, JR.               :
            Defendants.            :


## <u>RULING ON MOTION FOR SUMMARY JUDGMENT</u>

In June 2002, Melanie Wilson commenced an action in the Connecticut Superior Court against defendants Louis T. Fusaro (the Chief of the Norwich Police Department), the City of Norwich ("Norwich"), and James F. Daigle, Jr., a former Norwich police officer. Norwich and Fusaro subsequently filed a notice to remove the case to this court.

Wilson's claims stem from two incidents: First, in September of 2000, Daigle allegedly took nude photographs of Wilson during an underage alcohol "sting" operation. In a second incident in December of 2000, Daigle allegedly took semi-nude photographs of Wilson for the supposed purpose of participating in a child pornography "sting". Counts One through Fourteen, Thirty-Five and Thirty-Six are directed to the co-defendant, James F. Daigle. Those claims are not at issue here.

Counts Fifteen through Thirty-Four and Thirty-Seven are brought against Chief Louis T. Fusaro and the City of Norwich. In Counts Fifteen and Sixteen, Wilson alleges that the respective parties are liable for negligent supervision under Connecticut law, concerning Daigle's conduct during the alcohol "sting" investigation. Counts Seventeen and Eighteen allege

violations of Conn. Gen. Stat. § 46a-58.[1]  Counts Nineteen and Twenty allege violation of 42

U.S.C. § 1983.  Finally, Counts Twenty-One through Thirty-Four and Thirty-Seven all allege that

the City is responsible for indemnifying Wilson for Daigle's acts.  Chief Fusaro and the City of

Norwich have filed a motion for summary judgment, seeking to dismiss those counts.  For the

reasons set forth below, the motion is granted in part and denied in part.


I.    **Background**

    In September of 2000, Daigle was a Norwich police officer with the rank of sergeant.   He

was responsible for implementing Norwich's underage alcohol sales program.  This "sting"

program used underage volunteer operatives who attempted to buy alcohol either while wearing

concealed recording devices or accompanied by undercover Connecticut Department of Liquor

Control officers.  As part of the operation, the operatives were to be photographed as they

appeared during the investigation, apparently to demonstrate that the Department had not

selected underage operatives who appeared to be much older than their true ages.  Over the

course of 2000 and 2001, Daigle recruited three young women to serve as volunteer operatives.

He convinced each of them that, in addition to clothed photographs, the program also required

nude or partially nude photographs.  These young women were Melanie Wilson, Kirsten

Ejchorszt, and Theresa Earl.[2]

_____

    [1] Conn. Gen. Stat. § 46a-58 prohibits discrimination on the basis of sex and other
classifications.  See also note 4, infra.

    [2] Earl and Ejchorszt also filed suit in the District of Connecticut against Daigle, Fusaro
and Norwich.  See Ejchorszt v. Daigle, Civil No. 3:02-cv-1350 (CFD) and Earl v. Daigle, Civil
No. 3:03-cv-01323(SRU).  Norwich and Fusaro also filed motions for summary judgment in
these cases.  Their motion for summary judgment was granted absent opposition in the Earl case.

In September of 2000, Wilson, who was an acquaintance of James Daigle, volunteered to participate in the underage alcohol "sting" operation. Wilson was eighteen years old at that time. On September 15, 2000, the day of the first sting, Daigle came to Wilson's home to pick her up. Daigle brought with him a department-issued digital camera. Daigle told Wilson that he needed to take photographs of her without any clothing on in order to show that she was not wearing a "wire" or tape recorder. Daigle assured Wilson that taking such photographs was standard police procedure. Wilson believed that the photographs were necessary and allowed Daigle to take fully nude photographs of her front and back.

After taking the photographs, Wilson accompanied Daigle to the police station. There, Daigle took additional clothed photographs of Wilson using the same camera. Then, Daigle took Wilson on the sting operation to local package stores and bars.

Around October of 2000, Daigle again approached Wilson about her potential participation in a police operation. This time Daigle asked if she would be willing to pose for nude pictures in order to aid a purported child pornography investigation. Wilson at first refused, but later decided that she would be willing to pose for topless photographs in order to aid the purported investigation.

In December of 2000, Daigle brought Wilson to his house, where he took pictures of Wilson naked from the waist up. Daigle took 17 photographs of Wilson in various positions. There was no child pornography investigation authorized by the Norwich Police Department.

On December 3, 2001, Ejchorszt filed a complaint about Daigle with Chief Fusaro.

---

Their motion for summary judgment in the Ejchorszt case was granted in part and denied in part by this Court.

Deputy Chief Warren Mocek was assigned to investigate the complaint. Around this time, Daigle called Wilson and told her that he was not to have taken the nude or partially nude photographs of her, and that he had done so as the result of an honest error. Wilson agreed not to report the photographs.

During the investigation, Mocek contacted Wilson because of her role in the September 2000 sting operation. Mocek asked Wilson whether anything unusual had occurred and whether any pictures had been taken. Wilson denied that anything inappropriate had happened and that any pictures had been taken.

After reading news accounts of the incident involving Ejchorszt, Wilson again spoke to Daigle. According to Wilson, Daigle again indicated that the photographs "were not necessarily outside of protocol, but were 'unneeded,' because different situations were handled differently," and claimed that he had never taken inappropriate photographs of Ejchorszt.

As a result of publicity about the investigation, Earl came forward with allegations that Daigle had taken similar nude and semi-nude photographs of her with the pretext that they were needed for legitimate police purposes. After learning about the incident involving Earl, Wilson decided to report the photographs that Daigle had taken of her to Deputy Chief Mocek.

Following Mocek's six-month long investigation, Daigle was terminated from the Norwich Police Department for, among other things, conduct unbecoming an officer, violation of the department's strip search policy, failure to conform to the police code and canon of ethics, inappropriate use of his official position, neglect of duty, incompetence, and poor judgment.

In 1987 and 1998, Daigle had taken consensual nude and partially nude photographs of two female civilian employees of the Norwich Police Department and shared these photographs

with other members of the Norwich Police Department.  Sometime before the incidents in this

case, Fusaro became aware of Daigle's photographs of one of the employees during an

investigation of another police officer, but he had never seen those photographs.[3]

Daigle had received training on conducting strip searches of female prisoners, and had

received sexual harassment training.  Prior to September 2000, he had also received training on

conducting alcohol sting operations, but received no particularized training on working with

underage volunteers.

## II.    Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there

are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of

law.  See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A court

must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P.

5(c)); accord Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993).  A dispute regarding a

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  Anderson, 477 U.S. at 248.

_____

[3] Wilson presented evidence indicating that Daigle's photographs of the Department
employees were widely distributed within the Norwich Police Department.  While Wilson's own
evidence does not support her claim that Fusaro was personally aware of the photographs prior to
the investigation of the alcohol sting program, Ejchorszt presented evidence confirming that
Fusaro was aware of some of these photographs.  Wilson asked the Court to take notice of the
exhibits filed in opposition to the motion for summary judgment in the Ejchorszt case.

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the nonmovant's claim. Celotex, 477 U.S. at 323-25; Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir. 1998). Once the movant has established a prima facie case demonstrating the lack of a genuine issue of material fact, the nonmoving party must provide enough evidence to support a jury verdict in its favor. Anderson, 477 U.S. at 248; Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). A plaintiff may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible. Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Similarly, a plaintiff, as the nonmovant, may not rest "upon the mere allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(e). Therefore, after discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex, 477 U.S. at 323. When addressing a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Maffucci, 923 F.2d at 982.

## III.    The Defendants' Motion

Norwich and Fusaro concede Daigle violated Wilson's civil rights. However, they argue that they are not liable for Daigle's conduct. The Court will first address the issues concerning

the federal constitutional claims in Counts Nineteen and Twenty, then the state law claims in

Counts Fifteen through Eighteen, Twenty-one through Thirty-four, and Thirty-seven.

A.    **Section 1983 Claims**

Counts Nineteen and Twenty are claims brought against Chief Fusaro and Norwich under

42 U.S.C. § 1983 alleging violations of Wilson's right to substantive due process under the

Fourteenth Amendment to the United States Constitution.  See Poe v. Leonard, 282 F.3d 123,

138-39 (2d Cir. 2002) (recognizing Fourteenth Amendment right to bodily privacy in a similar

context).

In order to state a § 1983 claim against a municipality or its "policymakers," a plaintiff

must allege that the unconstitutional act occurred pursuant to an official policy or custom.

Monell v. Dep't of Social Services of the City of New York, 436 U.S. 658 (1978).  Also, "[a]

supervisor may not be held liable under section 1983 merely because his subordinate committed

a constitutional tort."  Poe, 282 F.3d at 140.  However, a supervisor may be liable if the plaintiff

can "affirmatively connect the supervisor's conduct to the subordinate's violative act or

omission."  Id., at 134 (quoting Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998)).

Wilson argues that Norwich is liable for Daigle's conduct because it delegated

policymaking authority to Daigle for the liquor investigation program, and that, through Daigle,

Norwich established a policy or custom of exploiting volunteers. Wilson also argues that Fusaro

is liable, in his capacity as Daigle's supervisor, because he failed to properly train and supervise

Daigle.  Next, Wilson argues that Fusaro was also a "policymaker" for Norwich, and that his

failure to properly supervise and train Daigle represented municipal policy.  Finally, Wilson

alleges that Fusaro and Norwich are directly liable because of a special relationship between

-7-

Wilson and the Norwich Police Department, and because Daigle represented a danger "created" by Fusaro.

### 1.    Daigle as a Purported "Final Policymaker"

According to Wilson, Daigle was vested with authority to make official municipal policy about the operation of the underage alcohol sting program, and thus Norwich should be liable for the manner in which Daigle operated the program.  "Where a plaintiff relies . . . on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.  The fact that a particular official-even a policymaking official-has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."  Pembaur v. City of Cincinnati, 475 U.S. 469, 481-482, 106 S.Ct. 1292, 1299 (1986) (internal footnote omitted). According to the Supreme Court of the United States:

> the authority to make municipal policy is necessarily the authority to make final policy.  When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.  Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.

City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 926 (1988) (plurality opinion) (holding that whether official is policymaker is governed by state law and is not issue of fact for jury to decide).  See also Jett v. Dallas Independent School Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 2723 (1989) (endorsing position of Praprotnik plurality that determination of who has

policymaking authority is a legal question based on state law).  In <u>Anthony v. City of New York</u>
the United States Court of Appeals for the Second Circuit confirmed that it does not accept "the
view that mere exercise of discretion was sufficient to establish municipal liability."  339 F.3d
129, 139 (2d Cir. 2003).  Thus, in <u>Anthony</u> the court rejected the plaintiff's argument that a New
York police sergeant who authorized two officers to take the plaintiff into custody was "a final
decision-maker because he had discretion to determine how to handle the particular situation at"
the scene.  <u>Id.</u> at 139-40.

Professor Chemerinsky, in analyzing the decisions of the United States Supreme Court
and lower federal courts providing guidance on when a municipal official becomes a policymaker
for § 1983 purposes, states that "much remains unclear as to which municipal officials should be
deemed to possess final decision-making authority."  E. Chemerinsky, Federal Jurisdiction § 8.5,
p. 497 (4th ed.2003).  However, "[t]he crucial question . . . is whether under state or local law,
including relevant customs or practices, the person has policy-making authority for the city."  <u>Id.</u>
at p. 499.

Construing the evidence in the light most favorable to the plaintiff, Daigle had
considerable discretion in the implementation of Norwich's undercover alcohol operation.  For
example, he determined when to conduct "stings," which stores and bars to investigate, which
other police officers would assist and which civilian volunteers to recruit.  However, Wilson has
neither established that these tactical decisions by Daigle were "final" nor that they represented
official policy for the purpose of deciding policymaker status under Section 1983.

Daigle's decisions cannot be viewed as final because he was still subject to overall
supervision by his superiors.  Daigle's decisions were at all times subject to review by several

layers within his chain of command.  Further, Daigle was subject to department policy that was

not of his own making.   Indeed, after his conduct came to light Daigle was investigated and

discharged for violating official policy including the department's strip search policy, the police

code and canon of ethics, and for inappropriate use of his official position.

In addition, Wilson has failed to demonstrate that Daigle's decision making amounted to

"policymaking."  Plaintiff has pointed to no state or local law, or custom or practice with the

force of law that gave Daigle policymaking authority for Norwich, even within the limited area of

the liquor control program or the purported child pornography effort.  There are many similar

initiatives undertaken by police departments to reduce certain types of criminal conduct, but they

do not necessarily confer "policymaker" status on the officers leading those efforts.  It would

seem that tactical decisions by unit leaders on operational aspects of law enforcement would not

ordinarily confer policymaker status on those unit leaders.  Cf. Auriemma v. Rice, 957 F.2d 397,

401 (7th Cir. 1992) ("[t]hat a particular agent is the apex of a bureaucracy makes the decision

'final' but does not forge a link between 'finality' and 'policy'") quoted by Hurdle v. Board of

Education of the City of New York 113 Fed.Appx. 423, 427 (2d Cir. 2004) (holding that

decision-making authority does not equate to policymaking authority).  Accordingly, Wilson has

failed to establish that Daigle was a final policymaker for Norwich concerning the liquor law

enforcement program or the claimed child pornography effort.

Wilson has also failed to present a genuine issue of material fact that Norwich had an

official custom of exploiting volunteers.  "[A]n act performed pursuant to a 'custom' that has not

been formally approved by an appropriate decisionmaker may fairly subject a municipality to

liability on the theory that the relevant practice is so widespread as to have the force of law."  Bd.

of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388

(1997). However, there is no evidence that other Norwich officers engaged in similar sexual

exploitation, or that policymaking officials were aware of Daigle's conduct before the first

victim's complaint, which led to an immediate investigation.

### 2.    Failure to Supervise by Fusaro

Wilson claims that Fusaro is liable under § 1983 for failing to properly supervise Daigle

in the sting program and the purported child pornography effort, especially in light of his prior

knowledge of Daigle's incident involving the photographs of his coworker.[4]

According to the United States Court of Appeals for the Second Circuit:

> a supervisor may be found liable for his deliberate indifference to the rights of others . . .
> for his gross negligence in failing to supervise his subordinates who commit such
> wrongful acts, provided that the plaintiff can show an affirmative causal link between the
> supervisor's inaction and her injury.

Poe, 282 F.3d at 140. "Plaintiff[ ] must establish [defendant's] deliberate indifference by

showing that 'the need for more or better supervision to protect against constitutional violations

was obvious,' but that [defendant] made 'no meaningful attempt' to forestall or prevent the

unconstitutional conduct." Amnesty America v. Town of West Hartford, 361 F.3d 113, 127 (2d

Cir. 2004) (citing Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir.1995)).

When a policymaking supervisor for a city is responsible for grossly negligent

supervision, both the supervisor and the city may be liable. Amnesty America, 361 F.3d at 126

("[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations

---

[4] As discussed above (see note 3), Wilson failed to present evidence suggesting that
Fusaro knew about Daigle's photographs of co-workers prior to 2001, but Ejchorszt presented
such evidence.

caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city "policy or custom" that is actionable under § 1983.' " (quoting <u>City of Canton v. Harris,</u> 489 U.S. 378, 388, 109 S.Ct. 1197 (1989))).  For example, in <u>Fiacco v. City of Rensselaer</u>, the Second Circuit found that a plaintiff may establish a basis for municipal liability by alleging that the city's policymakers were "knowingly and deliberately indifferent to the possibility that its police officers were wont to use excessive force and that this indifference was demonstrated by the failure of the City defendants to exercise reasonable care in investigating claims of police brutality in order to supervise the officers in the proper use of force."  783 F.2d 319, 326-27 (2d Cir. 1986).  In <u>Poe v. Leonard</u>, the Second Circuit considered whether a Connecticut state police supervisor was liable for a video recording his subordinate secretly made of a female volunteer while she was changing clothes in preparation for filming a training video for state police recruits.  282 F.3d 123 (2d Cir. 2002).  The Court held that the supervisor's prior knowledge of another training film by the officer which had an "over long focus on the [female] civilian's . . . upper thigh region" and an expressed desire by the officer to show "a lot of cleavage" in the new film was not enough to provide notice to the supervisor to invoke supervisory liability.  <u>Id.</u> at 145-47.  The Court refused to consider other relevant prior conduct by the officer because the supervisor was unaware of that conduct, and the Court found that the supervisor could not be liable for failing to review his subordinates' disciplinary record upon assuming command, absent some independent reason for him to do so.  <u>Id.</u> at 142.

Recently, another court within this district found no basis for municipal liability based on a police chief's failure to screen a constable prior to reappointment.  <u>Atwood v. Town of</u>

Ellington, 427 F. Supp.2d 136, 148 (D. Conn. 2006).  Even though the constable had a history

"which may have been suggestive of aggressive or violent tendencies toward women" the court

found that the police chief was not aware of this history and even if the chief were aware of it,

the constable's prior inappropriate conduct "would not necessarily have made it 'plainly obvious'

to the Town at the time that [the constable] might have had sexually abusive propensities."  Id. at

148.[5]  In a later decision, the Atwood Court also rejected the plaintiff's supervisory liability claim

against the constable's superior officer, a state trooper working for the Town of Ellington under a

"resident trooper" arrangement.  Atwood v. Town of Ellington, 468 F. Supp.2d 340 (D. Conn.

2007).  Even though the state trooper was aware of the constable's past inappropriate conduct,

the Atwood Court found that behavior insufficiently predictive of the constable's later

unconstitutional act.  Id. at 358.

In this case, Wilson has shown only that Fusaro was aware of one set of photographs

taken years earlier by Daigle of a consenting female colleague.  Even drawing all reasonable

inferences in Wilson's favor, this history was not enough to make it plainly obvious to Fusaro, or

to Norwich, that Daigle might abuse his position of authority in running the liquor sting

operation or in fabricating a child pornography "investigation" to cause young women to pose for

nude and semi-nude photographs.  It thus fails the Poe test that the information known to the

supervisor be sufficient to put a reasonable supervisor on notice that there was a high risk that the

subordinate would violate another person's constitutional rights.  Poe, 282 F.3d at 146.

---

[5] In Atwood, the constable sexually assaulted an intoxicated woman after he brought her
back to her motel room following an altercation outside a bar.  In the year preceeding the sexual
assault, the constable had twice handcuffed a female volunteer ambulance squad member against
her will and without justification, and threatened another female volunteer ambulance squad
member with pepper spray, also without justification.  Atwood, 427 F. Supp.2d at 141.

<u>                    3.      Failure to train</u>

Fusaro and Norwich also claim that they cannot be liable for failure to properly train Daigle because more training would not have prevented his wilful misconduct and because police departments are not responsible for providing training on what should be obvious matters. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." <u>City of Canton,</u> 489 U.S. at 389, 109 S.Ct. 1197. A plaintiff must also show that there is "a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury," such that it 'actually caused' the constitutional violation." <u>Amnesty America</u>, 361 F.3d at 129 (quoting <u>City of Canton,</u> 489 U.S. at 39, 109 S.Ct. 1197).

In order to establish that failure to train constitutes deliberate indifference to the constitutional rights of the public, a plaintiff must establish (1) that a policymaker knows "to a moral certainty" that his employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and finally (3) that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. <u>Walker v. City of New York</u>, 974 F.2d 293, 297-98 (2d Cir. 1992). However, a supervisor or municipality will not be liable where a "one-time negligent administration of the [training] program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." <u>Bd. of County Comm'rs of Bryan County, Okl. v. Brown</u>, 520 U.S. at 408, 117 S.Ct. 1382. Further, it is not sufficient to show that

-14-

a particular officer is unsatisfactorily trained. See City of Canton, 489 U.S. at 390-91, 109 S.Ct. 1197 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program").

Here Fusaro arguably knew that Daigle was likely to work with young female volunteers during his alcohol sting operations. However, there is no evidence, and it cannot reasonably be argued, that Daigle was faced with a difficult choice in deciding whether or not to abuse his position of authority to take nude photos of Wilson. Further, even if Daigle's acts reflect a mistake in judgment rather than wilful misconduct, there is no evidence that his mistake was the result of a faulty training program. Daigle did not need more training to convince him that this conduct was wrong; any reasonable person – or police officer – would likely know that this conduct was entirely inappropriate and could not be justified. Thus there is no genuine issue of fact about whether Daigle's conduct was caused by a faulty training program.

In addition, there is no genuine issue of fact suggesting that Fusaro was deliberately indifferent to Wilson's rights. There is no evidence from which to infer that Fusaro should have known that failing to provide Daigle with additional training would result in Wilson's injuries, or that training would have prevented Daigle's conduct.

The undisputed facts combined with the disputed facts construed in the light most favorable to Wilson are not sufficient to permit a reasonable jury to find Fusaro or Norwich liable for Daigle's violation of Wilson's constitutional rights under any of the theories advanced by Wilson.

Finally, the "special relationship" and "state created danger" doctrines[6] are inapposite and are unsupported by any evidence in the record.  Thus, summary judgment is granted in favor Fusaro and Norwich on Counts Nineteen and Twenty of Wilson's complaint.

**B.      State Law Claims**

   **1.      Negligent Supervision**

Counts Fifteen and Sixteen are state law claims against the City of Norwich and Fusaro for negligent supervision of Daigle.[7]  Under Connecticut law, "a municipal employee . . . has a qualified immunity in the performance of a governmental duty, but he may be liable if he misperforms a ministerial act, as opposed to a discretionary act."  Gordon v. Bridgeport Housing Authority, 208 Conn. 161, 166, 544 A.2d 1185 (1988) (Internal quotation marks omitted).  Municipalities are similarly immune from liability "for damages to person or property caused by . 

_____

   [6] In DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the United States Supreme Court suggested that the state had a duty to protect a victim who had a special relationship with the state, or from a danger created by the state.
   The "special relationship" duty exists where the state "has imposed [some limitation] on [the injured person's] freedom to act on his own behalf."  Clarke v. Sweeney, 312 F. Supp.2d 277, 294 (D. Conn. 2004) (quoting DeShaney, 489 U.S. at 200, 109 S.Ct. 998).  There is no evidence that Wilson's ability to act on her own behalf was limited by reason of serving as a volunteer for the Norwich Police Department.
   In Dwares v. City of New York, 985 F.2d 94 (2d Cir.1993), the Second Circuit found that "an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would . . . implicate [the victim's due process] rights." 985 F.2d at 99 (finding such state created danger where victim alleged that police conspired with attackers).  Here, while Daigle was himself a police officer there is no evidence that his superiors participated in his wrong-doing in any way.  Dwares and DeShaney were not intended to circumvent the general rule against respondeat superior liability in cases brought under § 1983.

   [7] Wilson's amended complaint only seems to claim negligent training and supervision concerning the alcohol sting operation.  To the extent that Wilson intended to allege that negligent training and supervision contributed to the purported child pornography investigation, the Court's analysis would be the same.

. . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." Conn. Gen. Stat. § 52-557n. Generally, supervising employees is such a discretionary activity. Gordon, 208 Conn. at 180, 544 A.2d 1185 ("the general deployment of police officers is a discretionary governmental action as a matter of law.") See also Peters ex rel. Estate of Peters v. Town of Greenwich, Docket No. CV950147192S, 2001 WL 51671, at *9 (Conn. Super. 2001) (compiling cases granting motions to strike claims of negligent supervision of police officers). However, Wilson argues that the "imminent harm" exception to the general rule of municipal liability applies because she was an identifiable victim.

"The imminent harm exception to discretionary act immunity applies when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm. By its own terms, this test requires that three parts be satisfied: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." Violano v. Fernandez, 280 Conn. 310, 329, 907 A.2d 1188, 1199 - 1200 (Conn. 2006) (holding that it was appropriate to grant motion to strike based on governmental immunity). An "identifiable victim" may be any member of a narrowly defined class of foreseeable victims. Purzycki v. Fairfield, 244 Conn. 101, 108, 708 A.2d 937 (1998) (holding that imminent harm exception applied to schoolchild who was tripped while walking down unsupervised stairs because the danger was limited in terms of duration and geographical area and risk of harm was significant and foreseeable). Here, while the class of underage female volunteers may be narrowly defined, Wilson has not presented evidence that they faced an imminent harm about which Fusaro or

Norwich should have been aware.  As described above, Wilson has not presented evidence that

Fusaro should have known that Daigle was likely to sexually exploit the female volunteers he

recruited.  Thus, the imminent harm exception does not apply and summary judgment is also

granted as to Counts Fifteen and Sixteen.

### 2.    Violation of C.G.S. §46a-58

Because there is no private right of action under C.G.S. §46a-58,[8] (see Alungbe v. Bd. of

Trustees of Conn. State Univ. System, 283 F. Supp.2d 674, 687 (D. Conn. 2003)) and Wilson

does not object to entry of summary judgment on Counts Seventeen and Eighteen, summary

judgment is granted as to these counts.

### 3.    **Indemnification**

Counts Twenty-One through Thirty-Four and Thirty-Seven seek indemnification of

Daigle by Norwich under Conn. Gen. Stats. §§ 7-101a and 7-465.[9]  Conn. Gen. Stats. § 7-465

---

[8] Section 46a-58(a) provides:
(a) It shall be a discriminatory practice in violation of this section for any person to
subject, or cause to be subjected, any other person to the deprivation of any rights,
privileges or immunities, secured or protected by the constitution or laws of this state
or of the United States, on account of religion, national origin, alienage, color, race,
sex, blindness or physical disability.

[9] Conn. Gen. Stats. § 7-465 provides in part that:
Any town, city or borough, notwithstanding any inconsistent provision of law,
general, special or local, shall pay on behalf of any employee of such municipality . . .
all sums which such employee becomes obligated to pay by reason of the liability
imposed upon such employee by law for damages awarded for infringement of any
person's civil rights . . . if the employee, at the time of the occurrence, accident,
physical injury or damages complained of, was acting in the performance of his duties
and within the scope of his employment, and if such occurrence, accident, physical
injury or damage was not the result of any wilful or wanton act of such employee in
the discharge of such duty. . . .No action for personal physical injuries or damages to
real or personal property shall be maintained against such municipality and employee
jointly unless such action is commenced within two years after the cause of action

requires municipalities to indemnify employees for liability imposed for violations of any person's civil rights as long as the employee "was acting in the performance of his duties and within the scope of his employment" and the injury "was not the result of any wilful or wanton act."

As a preliminary matter, several of Wilson's indemnification counts fail to assert a valid predicate tort. Counts Twenty-one, Twenty-three, Twenty-seven, Twenty-eight, Thirty-one, Thirty-two, Thirty-three, and Thirty-four seek indemnification for intentional torts. Accordingly, summary judgment is granted as to these counts. Counts Twenty-two and Twenty-four seek indemnification for counts alleging violation of C.G.S. §46a-58, for which there is no private cause of action. Thus, summary judgment is also granted as to these counts.

Wilson's remaining indemnification counts seek compensation for negligent infliction of emotional distress, negligent misrepresentation, and Wilson's claims under § 1983. Conduct is within the scope of employment if it is designed to advance any interest of the employer, or is "reasonably incidental to the performance of employment duties." <u>Martin v. Brady</u>, 261 Conn. 372, 375, 378, 802 A.2d 814, 818 (Conn. 2002) (holding that police officers acted within scope of employment when they 1) forcibly entered the plaintiff's home without a search warrant, 2) struck and pushed him to the floor after submitting to arrest, 3) searched his home using a warrant obtained pursuant to a false affidavit, and 4) during that search, smashed windows and broke down doors).

---

therefor arose and written notice of the intention to commence such action and of the time when and the place where the damages were incurred or sustained has been filed with the clerk of such municipality within six months after such cause of action has accrued.

Daigle used his authority as a police officer to obtain the first set of "alcohol sting" photographs and claimed that they were needed for a legitimate evidentiary purpose associated with actual police activity.  Accordingly, there is at least a genuine issue of fact about whether the photographs allegedly taken in furtherance of the alcohol sting program were within the scope of Daigle's employment.[10]

However, no reasonable jury could conclude that the second set of "child pornography sting" photographs were within the scope of Daigle's employment.  While Daigle again used his authority as a police officer to obtain the photographs, and claimed that they were needed for official police business, these photographs were not associated with actual police business.  Rather, Daigle's alleged photographs were motivated by purely personal considerations entirely extraneous to his employer's interest.  Wilson concedes that Daigle fabricated the child pornography investigation that was used as a pretext to obtain the photographs, and does not suggest that Daigle was in any part motivated by a purpose to serve a legitimate interest of the Norwich Police Department when he took the photographs.  Accordingly, summary judgment is granted as to the indemnity counts related to this set of photographs: Counts Twenty-six, and Thirty, and Count Thirty-seven to the extent that it is predicated by Count Thirty-six.

"[W]anton acts are the equivalent of acts done recklessly or with callous disregard," but are not equivalent to acts committed with indifference or negligence to the rights of others.  City of West Haven v. Hartford Ins. Co., 221 Conn. 149, 161, 602 A.2d 988, 994 (Conn. 1992); Manifold v. Ragaglia, 94 Conn. App. 103, 115-16, 891 A.2d 106 (2006).  "[F]indings regarding .

---

[10] Further, even if these photographs were taken within the scope of Daigle's employment, Daigle's fabrication of a child pornography investigation as a ruse to obtain topless photographs of Wilson is inconsistent with mere negligence.

. . reckless indifference or malicious intent of the defendants are factual findings." Suffield

Development Associates Ltd. Partnership v. National Loan Investors, L.P., 97 Conn. App. 541,

577, 905 A.2d 1214, 1235 (Conn. App. 2006).

Here, although it is a close question even for the Court, there is a genuine issue of

material fact about whether Daigle acted wantonly or merely with indifference or negligence

towards Wilson's rights when he took the "alcohol sting" photographs. In particular, in her

complaint to the Norwich Police Department, Wilson claimed that Daigle represented to her that

he believed that his actions were not inconsistent with department policy and that he believed

there was a legitimate police purpose for the photographs.[11]

Norwich also argues that Wilson's indemnification claims are barred because she did not

submit a claim notice within six months of the incidents involving Daigle. However, C.G.S. §7-

465 only requires that notice be provided within six months after a cause of action accrues. A

cause of action accrues "when the plaintiff discovers, or in the exercise of reasonable care,

should have discovered the essential elements of a cause of action." Tarnowsky v. Socci, 271

Conn. 284, 288, 856 A.2d 408, 411 (Conn. 2004). Because the causal connection between the

defendant's breach and the plaintiff's resulting injury is an essential element, a cause of action

does not accrue until the plaintiff learns about the causal connection. Catz v. Rubenstein, 201

Conn. 39, 44, 513 A.2d 98 (1986). According to Wilson, she did not learn that the alcohol sting

photographs were not required by police protocol until at least December 2001. Accordingly,

there is at least a genuine issue of fact suggesting that her cause of action did not accrue until this

---

[11] Daigle repeated that he believed that the "alcohol sting" photographs were consistent with official policy during his deposition. A copy of Daigle's deposition testimony was submitted in opposition to Norwich's motion for summary judgment in the Ejchorszt case.

time, and, for the purpose of summary judgment, her claim notice was timely.

Thus, summary judgment is denied as to Counts Twenty-five and Twenty-nine, and Count Thirty-seven to the extent that it is predicated upon Count Thirty-five.

## IV.     <u>Conclusion</u>

The Norwich defendants' motion for summary judgment [Dkt. # 76] is **GRANTED** as to Counts Fifteen through Twenty-Four, Twenty-Six through Twenty-Eight, and Thirty through Thirty-four.  It is **DENIED** as to Counts Twenty-five, Twenty-nine and Thirty-seven.  The counts against Daigle also remain.

SO ORDERED this   5th   day of September 2007, at Hartford, Connecticut.

 **/s/ Christopher F. Droney**
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**